IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SAMUEL B. INGALL,<br><br>Plaintiff,<br><br>v.<br><br>JOHN RABAGO; REGINALD RAMONES; CHIEF OF POLICE SUSAN M. BALLARD; CITY AND COUNTY OF HONOLULU; DOE OFFICER 1; DOE OFFICER 2,<br><br>Defendants. | Civ. No. 20-00306 ACK-WRP |

## ORDER GRANTING IN PART AND DENYING IN PART
## THE CITY AND CHIEF BALLARD'S MOTION TO DISMISS (ECF NO. 16)

This case stems from an extremely disturbing incident in which a Honolulu Police Department ("HPD") officer threatened to arrest Honolulu resident Plaintiff Samuel Ingall if he did not lick a urinal in a public restroom. The officer used his position of power to humiliate Plaintiff, who felt he had no choice but to comply. After the incident resulted in criminal charges against and guilty pleas from the two officers involved, Plaintiff filed this civil action against those officers, two Doe Defendant officers, the City and County of Honolulu (the "City"), and Chief of Police Susan M. Ballard ("Chief Ballard"), asserting violations of state law and Plaintiff's federal constitutional rights. The Court previously dismissed several of Plaintiff's claims but gave him leave to amend. See ECF No.

13 (the "Prior Dismissal Order").  The City and Chief Ballard
(together, the "Moving Defendants") now seek dismissal of the
claims asserted against them in the First Amended Complaint, ECF
No. 15 ("1AC").  For the reasons discussed below, the Court
GRANTS IN PART and DENIES IN PART the Moving Defendants' Motion
to Dismiss, ECF No. 16 (the "Motion").

<u>**BACKGROUND**</u>

        This case began in state court on January 28, 2020,
but the City removed the case six months later.  <u>See</u> ECF Nos. 1
& 1-2.  As soon as the case was in federal court, the City and
Chief Ballard moved to dismiss the claims against them, ECF No.
5, which the Court granted in part and denied in part.  <u>See</u>
Prior Dismissal Order.  Having been granted leave to amend
certain claims, Plaintiff filed the 1AC on October 23, 2020.  In
it, he alleges mostly the same facts and causes of action but
removes certain state-law causes of action and adds additional
factual allegations to bolster his allegations of a pattern or
practice for purposes of establishing municipal liability.
Relevant to the Motion now before the Court, Plaintiff brings
constitutional claims against the Moving Defendants (the City
and Chief Ballard) under 42 U.S.C. § 1983 for violations of his
Fourth, Eighth, and Fourteenth Amendment rights.  1AC ¶¶ 42-107.

## I.   Factual Background

The Court summarizes the factual allegations below, all of which are taken from the 1AC and the guilty pleas in the associated criminal case, which the 1AC expressly incorporates by reference.[1/]   See United States v. Rabago, Cr. No. 19-00040 LEK (D. Haw.), ECF No. 35; United States v. Ramones, Cr. No. 19-00139 LEK (D. Haw.), ECF No. 6.

### a. The 2018 Incident & Criminal Charges

On January 28, 2018, Plaintiff—homeless at the time—sought shelter at 808 Sheridan Street in Honolulu.[2/]   1AC ¶ 12. While he was inside a public restroom, Officer John Rabago confronted him and "in an aggressive tone" told him to lick a urinal or else he would be arrested.   1AC ¶¶ 11-13.   Officer Reginald Ramones soon arrived.   1AC ¶ 14.   He initially stood in the entryway with the door propped open.   1AC ¶ 14.   Officer Rabago had indicated that there was a security camera outside

---

[1/]   Although the plea agreements were not attached to the 1AC, the Court finds that the pleas are incorporated by reference.   The Court found the same in the Prior Dismissal Order.   See Prior Dismissal Order at 14-15.   For the same reasons discussed therein, the Court finds incorporation by reference remains appropriate for the 1AC.   The guilty pleas are mentioned or quoted almost verbatim several times in the 1AC.   See 1AC ¶ 2 n.1 (expressly incorporating the guilty pleas by reference).   Although the Moving Defendants did not object to incorporation by reference as to the original complaint, for some reason at the recent hearing they objected to incorporation as to the 1AC.   In any event, the Court sees no reason why they should not be incorporated into the 1AC when they were incorporated into the original complaint.   And the Court need not rely extensively on the guilty pleas anyway, given that Plaintiff recounts most of the relevant stipulated facts and admissions in the 1AC.

[2/]   While not specifically alleged in the 1AC, the facts stipulated to in both Officers' plea agreements establish that Plaintiff was homeless at the time of the incident.

the restroom door that would only capture the inside of the restroom if the door was open, so he told Officer Ramones to close the door, which Officer Ramones did.  1AC ¶¶ 15-18.

Thereafter, Officer Rabago repeatedly told Plaintiff to lick the urinal or face arrest.  1AC ¶ 20.  Plaintiff ultimately complied and was then permitted to gather his possessions and leave.  1AC ¶¶ 21-22.  Officer Rabago followed Plaintiff out of the restroom and laughed while telling two additional HPD officers who were waiting outside about the incident.  1AC ¶ 24.  While speaking to those officers, Officer Rabago referred to the incident as "just like what happened at Cartwright Field."  1AC ¶ 25.

Plaintiff alleges that throughout the encounter the Officers "were in agreement" and intended to intimidate Plaintiff.  1AC ¶ 19.  He also alleges that both Officers had been involved in a prior similar incident at Cartwright Field (the one to which Officer Rabago had referred), and that they therefore knew that the threat "was not a joke."  1AC ¶ 23.  The 1AC does not expand on what exactly happened at Cartwright Field other than to suggest it may have involved a similar incident to the one involving Plaintiff and Officers Rabago and Ramones. See 1AC ¶¶ 23, 25, 61.

According to the 1AC, Officers Rabago and Ramones later learned that the incident was being investigated by HPD's

Professional Standards Office and possibly by federal authorities.  1AC ¶ 29.  Plaintiff alleges that, upon learning this, Officer Rabago told Officer Ramones to delete text messages from his phone, advised him not to tell authorities about what had happened, and coached him on what to say to authorities.  1AC ¶¶ 30-32.  Both Officers were criminally charged in connection with the incident and with their concealing thereof and both enter guilty pleas.  1AC ¶ 40.  In their plea agreements they admitted to the events alleged by Plaintiff in this lawsuit.  Id.

### b. The 2014 Game-Room Incident

To bolster his municipal-liability claim against the City—which the Court previously dismissed for pleading deficiencies—Plaintiff adds allegations about a prior incident that took place on September 5, 2014, four years before the restroom incident at issue here.  1AC ¶¶ 64-95.  According to Plaintiff, on-duty HPD officers who were part of the Crime Reduction Unit ("CRU") forced entry into a "game room."[3/]  1AC ¶¶ 64-66.  The CRU officers did not have a warrant but demanded entry on the basis that they were looking for a fugitive.[4/]  1AC

---

[3/] The 1AC does not explain what a "game room" is or its relevance to Plaintiff's case.  In his Opposition, he calls it "a video arcade for adults."  Opp. at 2.

[4/] The 1AC suggests that Officers Ramones and Rabago were not involved in the 2014 event and were not part of the CRU.  Counsel for Plaintiff confirmed as much at the hearing.

¶¶ 66-67, 70.  Upon entering, officers kicked a man in the face without provocation, searched the game room, and returned to assault the same man and at least one other person by punching, kicking, striking, and throwing a chair at them.  1AC ¶ 69-70, 73, 75.  According to the 1AC, two other HPD officers guarded the door and did not intervene.  1AC ¶ 71, 76.

The entire event was captured on the game room's video surveillance but, according to Plaintiff, the officers involved agreed to conceal what happened.  1AC ¶¶ 78-81.  Plaintiff alleges that the officers were comfortable lying despite knowledge of the video surveillance because it was "well known" that the City would not enforce the personal liberty or property rights of persons associated with game rooms or who otherwise "lack the credibility to complain."  1AC ¶ 82-84.  Plaintiff alleges that during an interview, one of the officers who guarded the door reported feeling unable to speak out during the incident, citing a "habit and custom of not questioning a fellow police officer in public" for "fear of repercussion."  1AC ¶¶ 85-91.

All that said, the 1AC also alleges that several of the officers involved in the 2014 game-room incident were in fact criminally charged and convicted.  1AC ¶ 85.

- 6 -

## II.  Procedural Posture

The City and Chief Ballard filed the instant Motion on November 6, 2020, seeking to dismiss the claims asserted against them in the 1AC.  Plaintiff filed his Opposition on January 5, 2021, ECF No. 19, and the Moving Defendants filed their Reply on January 12, ECF No. 20.  A telephonic hearing was held on January 26.

## STANDARD

The Moving Defendants seek dismissal under Federal Rule of Civil Procedure ("Rule") 12(b)(6), the standard for which is well settled under Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  Plaintiff argues for the completely wrong standard under the Federal Rules, citing Twombly for the exact opposite of what it actually held.  See Opp. at 3-4 & 6-8.  Contrary to Plaintiff's discussion, that Twombly governs the pleading standard in this case is uncontroversial.  See AE ex rel. Hernandez v. Cty. of Tulare, 666 F.3d 631, 637 (9th Cir. 2012) (finding that the Twombly standard applies to Monell claims for municipal liability under § 1983).  Without giving attention to Plaintiff's remarkable argument that is directly contrary to Twombly (and the Court's prior overview of the well-settled Rule

- 7 -

12(b)(6) standard in the Prior Dismissal Order), the Court describes the standard below.[5/]

Rule 12(b)(6) authorizes the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although Rule 8 does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citing Twombly, 550 U.S. at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929).

The Court must "accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party." Sateriale v. R.J.

---

[5/]  Plaintiff incorrectly asserts that the "'plausible facts' test is not applicable here," and that "[t]he proper standard for[ ]a 12(b)(6) analysis is whether the plaintiff has plead 'no set of facts' which demonstrate the factual element of his claim." Opp. at 7 (purporting to cite Twombly). That is exactly the opposite of what Twombly held. See Twombly, at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (discussing the plausibility requirement); id. at 562-63, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (finding that the "no set of facts" phrase "is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

Reynolds Tobacco Co., 697 F.3d 777, 784 (9th Cir. 2012).  "To
survive a motion to dismiss, a complaint must contain sufficient
factual matter to 'state a claim to relief that is plausible on
its face.'"  Id. (quoting Iqbal, 556 U.S. at 678, 129 S. Ct.
1937, 173 L. Ed. 2d 868).  "A claim has facial plausibility when
the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable for
the misconduct alleged."  Iqbal, 556 U.S. at 678, 129 S. Ct.
1937, 173 L. Ed. 2d 868 (citing Twombly, 550 U.S. at 556, 127 S.
Ct. 1955, 167 L. Ed. 2d 929).

        "[T]he tenet that a court must accept as true all of
the allegations contained in a complaint is inapplicable to
legal conclusions."  Id. (citing Twombly, 550 U.S. at 555, 127
S. Ct. 1955, 167 L. Ed. 2d 929).  Accordingly, "[t]hreadbare
recitals of the elements of a cause of action, supported by mere
conclusory statements, do not suffice."  Id.  "The plausibility
standard . . . asks for more than a sheer possibility that a
defendant has acted unlawfully."  Id.  "Where a complaint pleads
facts that are 'merely consistent with' a defendant's liability,
it 'stops short of the line between possibility and plausibility
of entitlement to relief.'"  Id. (quoting Twombly, 550 U.S. at
557, 127 S. Ct. 1955, 167 L. Ed. 2d 929).

        When the Court dismisses a complaint pursuant to Rule
12(b)(6) it should grant leave to amend unless the pleading

cannot be cured by new factual allegations.  OSU Student All. v. Ray, 699 F.3d 1053, 1079 (9th Cir. 2012).  "In order to determine whether leave to amend should be granted, the Court must consider 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment, etc.'"  Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1051–52 (9th Cir. 2003) (quoting Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)).  Leave to amend need not be granted where doing so would be an exercise in futility.  Ascon Props., Inc. v. Mobil Oil Co., 86 F.2d 1149, 1160 (9th Cir. 1989).  "A district court may deny a plaintiff leave to amend if it determines that allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency, or if the plaintiff had several opportunities to amend its complaint and repeatedly failed to cure deficiencies."  Telesaurus VPC, LLC v. Power, 623 F.3d 998, 1003 (9th Cir. 2010) (internal citations and quotation marks omitted).

## DISCUSSION

Plaintiff asserts constitutional claims under 42 U.S.C. § 1983 against the City and Chief Ballard, based on theories of municipal and supervisory liability.  The Moving

Defendants seek to dismiss the claims against them, which hinge on violations of the Plaintiff's Fourth, Eighth, and Fourteenth Amendment rights under the U.S. Constitution.  The Court begins by addressing some miscellaneous arguments and a concession, and then proceeds to analyzing the theories of municipal liability for the constitutional claims against the city, followed by considering the theory of supervisory liability for the constitutional claims against Chief Ballard.

## I.   Miscellaneous Issues

The Court will address up front a handful of miscellaneous issues before turning to the core questions related to municipal and supervisory liability under § 1983.

### A. State Law Claims

First, the Moving Defendants argue that Plaintiff asserts state law claims against them but that those claims fail.  Mot. at 18-22.  The Court finds that Plaintiff does not allege any state law claims against either the City or Chief Ballard in the First Amended Complaint.  Rather, Plaintiff asserts the state law claims only against the "Officer Defendants," defined as "Defendants RABAGO, RAMONES, [and] DOE OFFICERS 1 and 2."  1AC ¶¶ 11, 43, 46, 50, 53.  Plaintiff confirms this in his Opposition.  See Opp. at 19 (explaining that the state-law claims against the Moving Defendants "were removed from the First Amended Complaint").

The Moving Defendants' Motion is DENIED to the extent that it seeks dismissal of non-existent state law claims against the Moving Defendants.

## B. Official-Capacity Claims

The Moving Defendants also argue that Plaintiff improperly asserts official-capacity claims against Officers Rabago and Ramones, and Chief Ballard, when the Court already dismissed those claims in the Prior Dismissal Order with prejudice. Mot. at 22. The Court finds that Plaintiff does not allege any official-capacity liability against the individual officers in this case. The 1AC makes clear that each officer "is being sued in his individual capacity." 1AC ¶¶ 4-8. Plaintiff confirms this reading in his Opposition. See Opp. at 19 ("Plaintiff also made it clear in his First Amended Complaint that as to the Officer Defendants, they are being sued in their individual capacities . . . .").

The Moving Defendants' Motion is DENIED to the extent that it seeks dismissal of non-existent official-capacity claims, which were already dismissed with prejudice.

## C. Conspiracy Claim

Third, the Moving Defendants argue that Plaintiff appears to assert a conspiracy claim under § 1985(3), although Plaintiff does not allege any cause of action for that claim. Mot. at 17-18. In the absence of any such cause of action, the

Court does not construe the First Amended Complaint as asserting a § 1985(3) claim.[6/]  Plaintiff in his Opposition confirms the Court's understanding.  <u>See</u> Opp. at 18 (noting confusion at the Moving Defendants' argument about a "conspiracy claim" and stating that the referenced language is "taken directly from the federal guilty pleas" of the officers).

The Moving Defendants' Motion is DENIED to the extent that it seeks dismissal of a non-existent conspiracy claim against the Moving Defendants.

**D. Eighth Amendment Claim**

One of Plaintiff's claims against the Moving Defendants asserts a violation of his Eighth Amendment Rights. 1AC ¶ 96.  The Moving Defendants argue that the claim is "inapplicable" because the "Eighth Amendment does not apply to non-penal situations."  Mot. at 16.  Plaintiff in his Opposition concedes that his Eighth Amendment claim is inapplicable because "he was not imprisoned at any time during the relevant incident."  Opp. at 16-17.  The Court agrees with both parties that, Plaintiff's description of the relevant events and his concession on the factual point (that he was never imprisoned) establish an independent grounds for dismissing the Eighth Amendment claim against the City and Chief Ballard.

---

[6/]  The Court found the same in the Prior Dismissal Order at 29.

### E. Doe Defendants 1 and 2

Finally, the Moving Defendants argue in their Reply that Doe Defendants 1 and 2 should be dismissed because Plaintiff in his Opposition "admits that [he] obtained police reports relating to the subject incident in this case and the incident at Cartwright Field, yet . . . still declined to amend the FAC to identify Doe Defendants."[7]  Reply at 13 (internal citation omitted).

The Court declines to dismiss the Doe Defendants; doing so would be premature.  All Plaintiff said in his Opposition was that he obtained the publicly available police reports, but without further discovery he does not have access to the internal investigative reports and files.  As the Court explained in the Prior Dismissal Order, Plaintiff provided sufficient identifiers for Does 1 and 2, which will allow for targeted discovery to determine their identities.  See Prior Dismissal Order at 10 ("When situations arise, however, 'where the identity of alleged defendant[] [is] not [] known prior to the filing of a complaint,' a plaintiff 'should be given an opportunity through discovery to identify the unknown

---

[7]  At the hearing, Plaintiff urged the Court to reject this argument because it was raised for the first time in the Reply.  Ordinarily, the Court would not consider arguments raised for the first time in a reply brief.  The Court finds, however, that the Moving Defendants raising the issue for the first time in their Reply is not a reason to discount the argument here, when it was raised directly in response to a statement Plaintiff made in his Opposition suggesting that he had obtained certain police reports.  See Reply at 13 (citing Opp. at 20).

defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds.'" (quoting Wakefield v. Thompson, 177 F.3d 1160, 1163 (9th Cir. 1999))).  Plaintiff's counsel represented at the hearing that they had not determined the specific identities of the two Doe officers, and the Moving Defendants have not indicated that such information would be obtained from the public versions of the reports Plaintiff has access to.

Accordingly, the Court reiterates its prior determination that Plaintiff sufficiently identifies Does 1 and 2 as the two police officers who stood outside of the restroom during the incident and who were told by Officer Rabago about the incident.  The Court thus denies the Moving Defendants' Motion to the extent that it seeks dismissal of Does 1 and 2. Plaintiff should timely file designations identifying the Doe Defendants once that information is exposed through discovery.

## II.  Municipal Liability Under § 1983

The Court now turns to Plaintiff's attempt to hold the City and Chief Ballard liable for the 2018 incident with Plaintiff at the public restroom.  In their Motion, the Moving Defendants contend that Plaintiff fails to state a claim for municipal and supervisory liability under § 1983, primarily because he cannot allege prior repeated patterns, customs, or

incidents to support any theory of liability.  For the reasons discussed herein, the Court agrees.

The Ninth Circuit has articulated the requirements of a "Monell" claim to hold a municipality liable under § 1983 as follows:  a plaintiff must show "(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'"  Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting City of Canton v. Harris, 489 U.S. 378, 389-91, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)); see also Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  With respect to the second prong, "municipalities may be liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker."  Horton by Horton v. City of Santa Maria, 915 F.3d 592, 602-03 (9th Cir. 2019).

Here, Plaintiff does not allege any official policy or any decision or act by a final policymaker.  See generally 1AC; see also Opp. at 9-14.  Thus, he must show either a longstanding informal practice or custom, or a failure to train, supervise,

or discipline.[8/]  As discussed below, he fails to plead facts to support either.

### 1.   Longstanding Informal Practice or Custom

To establish a longstanding informal practice or custom, a plaintiff must show that the alleged custom is "so persistent and widespread that it constitutes a permanent and well settled city policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (citing Monell, 436 U.S. at 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Id.

Plaintiff has a hard time articulating a specific policy.  The 1AC repeats similar conclusory refrains and references various "policies" together, making it difficult to identify the specific policies alleged.  The Opposition describes "an informal policy of mistreating (through force and intimidation), abusing, threatening, or harassing the homeless and generally those individuals that are not likely to be seen as credible and/or are prone to not being believed in a

---

[8/]  In his Opposition, Plaintiff chastises the Moving Defendants for characterizing his claims as having to allege an "informal policy," Opp. at 10, yet he himself refers to it as such, id. at 9.

situation involving law enforcement."[9/]  Opp. at 9.  But then at the hearing, Plaintiff concentrated on a policy of condoning outrageous behavior or behavior that shocks the conscience.  In any event, the Court views the 1AC as asserting three broad policies:  (1) an informal policy of targeting or denying liberty and property rights to those who frequent game rooms or public restrooms and who cannot credibly report misconduct; (2) an informal policy of condoning, ratifying, or failing to punish or prevent the use of excessive force or severe punishment by HPD officers; and (3) an informal policy of officers not publicly questioning their fellow officers.[10/]

No matter the contours of the policies alleged, the 1AC lacks factual allegations to support them.  Plaintiff relies on just two incidents preceding the one underlying this case.  First, he points to the "game room" incident that took place in 2014, four years before the incident with Plaintiff.  While he pleads the events of the game-room incident in great detail, 1AC ¶¶ 64-82, he does not plead facts to show how it is reflective of any informal policy that led to the restroom incident with Plaintiff four years later, nor does he explain how the two

---

[9/]  The allegation of targeting "homeless" individuals is not anywhere in the 1AC.

[10/]  The Moving Defendants' Motion identifies five policies, Mot. at 5-6, but based on the allegations and the 1AC and Plaintiff's explanation in his Opposition, the Court proceeds with categorizing the policies three-fold. The Court also notes that the "policies" regarding training are better analyzed under a theory of failure to train.

incidents are similar such that they would be evidence of a longstanding pattern or policy.  As for the second incident Plaintiff relies on to support his theory of an informal policy or custom—the "Cartwright Field" incident—the 1AC is devoid of any descriptive facts about what happened, other than the allegation that one of the Officers on the day of the encounter with Plaintiff referenced Cartwright Field, suggesting that it may have involved the same or similar circumstances.  1AC ¶¶ 23-25.

Having considered Plaintiff's added factual allegations of the 2014 game-room incident together with the prior incident at Cartwright Field (which was already pleaded much the same way in the original complaint), the Court finds that the 1AC still fails to establish a basis for municipal liability based on a longstanding informal policy or custom.

Plaintiff's broad articulations of informal practices or customs fail to meet the standard to establish municipal liability under the Monell framework.  For one, Plaintiff's allegation of a "longstanding" informal practice or custom is based on only two prior incidents (the game-room incident and the Cartwright Field incident), which took place four years apart with no intervening events to suggest a "pattern." Further, his allegation of a practice of "targeting those who cannot credibly report misconduct" is vague.  Plaintiff fails—in

both the 1AC and his Opposition—to allege who such individuals are, or to connect the individuals frequenting game rooms in the 2014 incident with individuals in public restrooms in the 2018 incident.  The Court understands that Plaintiff may have been homeless at the time of the 2018 incident, but there is no allegation that people who frequent game rooms are of a comparable population.  Simply put, the Court is unsure how any of the facts pleaded in the 1AC support a plausible inference that the City has a practice or custom of targeting "those who cannot credibly report misconduct," let alone a longstanding one.

Moreover, "[p]roof of random acts or isolated events is insufficient to establish custom." <u>Navarro v. Block</u>, 72 F.3d 712, 714 (9th Cir. 1995).  There is no explanation of why the game-room incident that took place four years before the restroom incident is evidence of a practice or custom, especially when there are no allegations of any related incidents in the intervening period.  And as for Cartwright Field, the 1AC contains no factual details.  Likely recognizing that, Plaintiff relies mostly on the game-room incident.  The problem is, there is no real correlation or similarity between the game-room public-restroom incidents.  Instead, "the diverse nature of the alleged violations highlights Plaintiff's overly-

- 20 -

broad articulation of [a] policy." Hollandsworth v. City & Cty. of Honolulu, 440 F. Supp. 3d 1163, 1178-79 (D. Haw. 2020).

The uniquely specific incident at issue here—that an officer humiliated Plaintiff by threatening him with arrest if he did not lick a urinal in a public restroom—has nothing to do with other officers (in a different HPD unit) using violence and force to conduct a warrantless search of a game room. See id. at 1179 (finding that it "stretches credulity" to view a seizure as comparable to a bar shooting). Both incidents are disturbing, to be sure. But that is not enough of a similarity to evince a longstanding or widespread policy or custom. It simply defies common sense to look at the incident with Plaintiff and relate it to the game-room incident four years prior to conclude that the City must have an unspoken policy allowing officers to broadly target "those who cannot credibly report misconduct," or to condone, ratify, or fail to punish or prevent incidents of excessive or unnecessary force or incidents that are outrageous or shock the conscience. See id. ("Plaintiff has provided no pattern or consistency to the types of violations that occurred, and the Court cannot equate the conduct surrounding Plaintiff's alleged seizure with the varied assortment of Plaintiff's other cited incidents.").

Despite the very troubling behavior of the Officers here and the CRU officers in the game-room incident, Plaintiff's

broad articulation of purported policies, patterns, and customs simply do not make any sense when considered against the different conduct and context alleged with respect to each of the incidents.  In sum, the Court finds that Plaintiff has pointed to no pattern or consistency in the incidents that occurred.

Other than the Cartwright Field incident and the 2014 game-room incident, the remainder of Plaintiff's allegations are conclusory and not entitled to the assumption of truth.  His assertion of a broad, generic policy of condoning excessive force, unreasonable searches, or outrageous or shocking officer conduct is simply too generic and not supported by plausible factual allegations.  Moreover, the 1AC and Opposition suggest that the game-room incident should have put the City on notice of the dangerous culture and wrongful conduct of the CRU officers.  Yet the 1AC does not even allege that Officers Rabago and Ramones were part of that unit, let alone that one incident involving the CRU could establish a broader pattern or practice throughout the HPD.

Finally, Plaintiff's last allegation of a policy that officers will not publicly question their fellow officers is not sufficiently pleaded.  See 1AC ¶¶ 86-89.  Plaintiff gives two examples, both of which—as discussed—involve completely different circumstances and do not support a plausible inference

that the City condoned a policy or practice of "not questioning a fellow police officer in public."  1AC ¶ 87.

All that said, even assuming that Plaintiff had established an informal policy, the existence of a policy alone is not enough to trigger Monell liability.  City of Canton, 489 U.S. at 388-89, 109 S. Ct. 1197, 103 L. Ed. 2d 412.  Plaintiff would also have to allege that the policy evidences a deliberate indifference to his constitutional rights.  Id. at 389.  Deliberate indifference is "a stringent standard of fault, requiring proof that the municipal actor disregarded a known or obvious consequence of his actions."  Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).  The 1AC lacks any non-conclusory allegations showing deliberate indifference.  Plaintiff would also have to allege that the policy was the "moving force behind the constitutional violation."  Oviatt, 954 F.2d at 1474 (quoting City of Canton, 489 U.S. at 389-91, 109 S. Ct. 1197, 103 L. Ed. 2d 412.  Yet Plaintiff failed to even articulate a clear policy, practice, or custom that could have led to the alleged violation here, let alone that a policy, practice, or custom was the "moving force" behind the violation.

While Plaintiff attempted to cure the defects in the original complaint by including allegations about the 2014 game-room incident, the allegations are still inadequate.  They rely

on entirely unrelated events, violations, and conduct; and the policies, customs, and practices Plaintiff alleges are either too generic or too tenuous.  For these reasons, the Court holds that Plaintiff has failed to state a Monell claim under the theory that the City has a longstanding custom or practice.

### 2.   Failure to Train, Supervise, or Discipline

The 1AC refers generally to the City's failure to train, supervise, and discipline without distinction.  See 1AC ¶¶ 99-104.  Because failure to train and failure to supervise involve virtually the same standard, the Court addresses them together.  The Court then turns to address the theory of a failure to discipline or ratification.

### a. Failure to Train or Supervise

To state a Monell claim based on a failure to train theory, a plaintiff must plead facts sufficient to allege that the municipality has an inadequate training program, that the municipality was deliberately indifferent to adequately training its law enforcement officers, and that the failure to train actually caused the plaintiff to be deprived of constitutional rights.  Merritt v. Cty. of L.A., 875 F.2d 765, 770 (9th Cir. 1989).  The Supreme Court has stated that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  Connick v. Thompson, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L. Ed. 2d 417

(2011).  "[A] municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"  Id. (quoting City of Canton, 489 U.S. at 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (alterations in original)).

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train" since, unless the City is on notice that a course of training is deficient, it "can hardly be said" to have acted with deliberate indifference.  Id. at 62, 131 S. Ct. 1350, 179 L. Ed. 2d 417. Nevertheless, the Supreme Court has "sought not to foreclose the possibility, however rare," that in certain situations "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  Id. at 64, 131 S. Ct. 1350, 179 L. Ed. 2d 417.  In either case, "[a]bsent allegations of specific shortcomings in the training of City police officers or facts that might place the City on notice that constitutional deprivations were likely to occur, [a] [p]laintiff has not adequately pled a § 1983 claim against the City for failure to train."  Bini v. City of Vancouver, 218 F. Supp. 3d 1196, 1203 (W.D. Wash. 2016).

A failure to supervise claim is subject to the same standard as a failure to train claim:  a plaintiff must allege that "the training or supervision is sufficiently inadequate as to constitute 'deliberate indifference' to the [rights] of persons with whom the police come into contact." Davis v. City of Ellensburg, 869 F.2d 1230, 1235 (9th Cir. 1989) (citing City of Canton, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412), overruled on other grounds by Beck v. City of Upland, 527 F.3d 853 (9th Cir. 2008).  This requires the plaintiff to allege that the City "was on actual or constructive notice that this failure to supervise would likely result in a constitutional violation." Jackson v. Barnes, 749 F.3d 755, 763 (9th Cir. 2014).

In the Prior Dismissal Order, the Court held that Plaintiff had failed to adequately allege a failure to train or supervise theory because (1) Plaintiff failed to identify any specific deficiency in the current training program, (2) he did not allege that the City had knowledge of any prior incident such that it would have been on notice that constitutional deprivations were likely to occur; and (3) this is not the rare case where the City can be said to have been deliberately indifferent in the absence of a pattern of prior violations. The only substantive factual addition Plaintiff made to the 1AC was to add allegations of the 2014 game-room incident.  He alleges that because this similar conduct or event occurred in

2014, the fact that his own incident occurred four years later is evidence that "the City has continued to fail at properly training" HPD officers.  1AC ¶ 95.  The Court does not see how the addition of that incident cures the deficiencies identified in the Prior Dismissal Order.

First, although Plaintiff alleges in conclusory form that the City and Chief Ballard knew or should have known of prior unconstitutional conduct or noncompliance with HPD rules, the 1AC still lacks any allegation of particular omission or deficiency in HPD's training programs.  "Allegations of inadequate training are insufficient where they do not identify what the training practices were, how the training practices were deficient, or how the training caused the specific Plaintiff's harm."  Hyer v. City & Cty. of Honolulu, No. CV 19-00586 HG-RT, 2020 WL 3440934, at *8 (D. Haw. June 23, 2020).  Plaintiff had to allege facts showing that the City "disregarded the known or obvious consequence that a particular omission in their training program would cause employees to violate" his rights.  Flores v. Cty. of L.A., 758 F.3d 1154, 1159 (9th Cir. 2014).  Plaintiff's allegations regarding the City and Chief Ballard's failure to train or supervise HPD officers are conclusory at best and factually do not plausibly lead to the broad inferences Plaintiff asks the Court to make.

Second, Plaintiff fails to establish the deliberate indifference required for a failure to train claim.  Again, Plaintiff must plead facts to establish a repeated pattern of "similar" constitutional violations.  Connick, 563 U.S. at 62, 131 S. Ct. 1350, 179 L. Ed. 2d 417.  As discussed, the 2014 game-room event is the primary incident on which Plaintiff relies.  Generally, one incident is not enough to establish a failure to train.  Manda v. Albin, No. 5:19-CV-01947-EJD, 2019 WL 6311380, at *8 (N.D. Cal. Nov. 25, 2019).  Even if it were enough, the Court has already explained how Plaintiff fails to show how the 2014 game-room incident is "similar" to the incident here.  However he tries to frame his allegations, it is clear that Plaintiff has not pleaded facts showing a repeated pattern of similar violations.

Finally, the Officers' conduct in the incident with Plaintiff is appalling and outrageous.  As the Court explained in the Prior Dismissal Order, it would have been near impossible for HPD to predict or anticipate the actions taken by these Officers, absent knowledge of prior similar incidents where the officers took advantage of their positions of authority to humiliate the public in a similar way.  See Prior Dismissal Order at 22; see also Hudson v. Palmer, 468 U.S. 517, 533, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984) ("Arguably, intentional acts are even more difficult [for the state] to anticipate [than

negligent acts] because one bent on intentionally depriving a person of his property might well take affirmative steps to avoid signalling his intent."). "[T]his is not the type of case where 'a violation of federal rights [was] a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations' such that the City can be said to have been deliberately indifferent in the absence of a pattern of prior violations." Prior Order at 23 (quoting Brown, 520 U.S. at 409, 117 S. Ct. 1382, 137 L. Ed. 2d 626). The Officers' shameful and malicious conduct toward Plaintiff and their attempts afterward to keep what happened under wraps suggest that proper training sadly would have made no difference in this case. See id. at 23-24.

Plaintiff tries to avoid this problem by arguing that the fact that two outrageous and shocking events took place is itself proof of a repeated pattern of HPD's failing to predict and prevent such conduct in its officers, and failing to amend the training programs. Again, the Court must reject this broad articulation. It cannot be that two entirely different incidents, in entirely different contexts, involving entirely different officers, four years apart could form the basis for a repeated "pattern" of similar constitutional violations. No matter how outrageous the Officers' treatment of Plaintiff was and how outrageous the CRU officers' treatment of the game-room

occupants was, those two incidents are not enough to establish the requisite culpability of the City.[11]

For those reasons, Plaintiff has failed to plead a plausible Monell claim under a failure to train or a failure to supervise theory.

### b. Failure to Discipline or Ratification

Plaintiff refers throughout the 1AC to the Moving Defendants' failure to discipline and their ratifying or condoning of officer misconduct.  Failure to discipline claims are often construed as claims of ratification.  Rabinovitz v. City of L.A., 287 F. Supp. 3d 933, 967 (C.D. Cal. 2018) ("Where a plaintiff alleges that a municipality's conduct runs afoul of section 1983 for the city's failure to discipline its employees, the claim is understood as one for ratification."); see also Haugen v. Brosseau, 351 F.3d 372, 393 (9th Cir. 2003) (explaining that the failure to discipline theory turned on an argument for subsequent ratification because the failure to discipline could not itself cause the already-completed misconduct), overruled on other grounds by Brousseau v. Haugen, 543 U.S. 194, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004).  However, a plaintiff may also argue that a municipality has a policy of failing to discipline its employees.  Hunter v. Cty.

---

[11] The Court notes once more that there are no factual details about the Cartwright Field incident, making it difficult to rely on that incident as evidence of a pattern or evidence of a training deficiency.

of Sacramento, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011) (holding that "evidence of inaction—specifically, failure to investigate and discipline employees in the face of widespread constitutional violations—can support an inference that an unconstitutional custom or practice has been unofficially adopted by a municipality").

Plaintiff does not make clear which theory he means to assert. Either way, his allegations in the 1AC do not establish Monell liability. The 1AC is clear that in each of the incidents the officers sought to keep their actions secret from their supervisors. And in both incidents, the officers were investigated and criminally charged for their misconduct. As the Court explained in the Prior Dismissal Order:

> [A]side from his naming the failure to discipline theory of liability, Ingall never alleges that HPD in fact failed to discipline the officers. Ingall's allegations that HPD conducted an investigation when HPD learned of the misconduct and that Officers Rabago and Ramones were subsequently criminally prosecuted for the conduct suggest that disciplinary action did in fact occur with respect to this incident.

Prior Dismissal Order at 18 (internal citation omitted). As to the game-room incident, the 1AC again is clear that HPD interviewed the officers and that several of them were even criminally convicted. 1AC ¶ 85.

For those reasons, and for many of the same reasons discussed earlier, Plaintiff's Monell claim based on a "failure to discipline" theory fails.

Because the 1AC fails to plead facts necessary to establish municipal liability under any of the above theories, the Moving Defendants' Motion is GRANTED to the extent that it seeks dismissal of the § 1983 claim against the City.

## III. Supervisory Liability of Chief Ballard under § 1983

In addition to his municipal liability claim to hold the City liable, Plaintiff asserts a claim against Chief Ballard in her individual capacity under a theory of supervisory liability.  "A supervisor can be liable in h[er] individual capacity for h[er] own culpable action or inaction in the training, supervision, or control of h[er] subordinates; for h[er] acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others."  Starr v. Baca, 652 F.3d 1202, 1208 (9th Cir. 2011) (quoting Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998)).

For many of the same reasons discussed above, the 1AC fails to plead factual allegations establishing the requisite culpability for Chief Ballard.  Plaintiff has not alleged that Chief Ballard was involved in the incident with Plaintiff in any capacity, that she had knowledge of any prior incidents similar

to the one with Officers Rabago and Ramones, or that she ratified the Officers' behavior in any way.  The 1AC also does not plead any formal policy decision by Chief Ballard, or allude to a viable informal policy that she ratified or condoned.  The game-room incident on which Plaintiff primarily hinges his argument fails to establish supervisory liability, just as it failed to establish municipal liability.

The Moving Defendants' Motion is GRANTED to the extent that it seeks dismissal of the § 1983 claim against Chief Ballard.[12]

**CONCLUSION**

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the Moving Defendants' Motion to Dismiss, ECF No. 16, as stated above.

The Motion is DENIED to the extent that it seeks dismissal of claims or theories not asserted in the 1AC, as well as with regard to the Doe Defendants.

The Motion is GRANTED to the extent that it seeks dismissal of the 1AC as against the City and Chief Ballard.  The

---

[12]  Because the Court has dismissed the § 1983 claim against the Moving Defendants for failing to establish either municipal or supervisory liability, the Court need not decide the merits of Plaintiff's specific constitutional claims.  Without a basis for municipal or supervisory liability against the City and Chief Ballard, there is no basis for asserting constitutional claims against those parties.

Court finds that Plaintiff has not plausibly alleged
a Monell claim under either a longstanding and widespread
practice or custom theory or a failure to train, supervise, or
discipline theory.  The Court is sympathetic in that it is
difficult to state a claim like this, especially without the
benefit of discovery.  But the Court cannot sanction what in
many ways appears to be a fishing expedition, particularly where
the pleading has twice failed to meet the standards required by
Iqbal and Twombly.  See Starr, 652 F.3d at 1216 ("[F]actual
allegations that are taken as true must plausibly suggest an
entitlement to relief, such that it is not unfair to require the
opposing party to be subjected to the expense of discovery and
continued litigation.").  Moreover, given Plaintiff's failure to
cure the deficiencies and the futility of amendment based on the
facts alleged, the Court finds that dismissal with prejudice is
warranted.  For those reasons, and because Plaintiff's addition
of a single incident in an entirely different context failed to
cure the deficiencies detailed by the Court in the Prior
Dismissal Order, the 1AC is DISMISSED WITH PREJUDICE as against
the Moving Defendants.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai`i, February 8, 2021.



_____
Alan C. Kay
Sr. United States District Judge

Ingall v. Rabago, et al., Civ. No. 20-00306 ACK-WRP, Order Granting in Part and Denying in Part the City and Chief Ballard's Motion to Dismiss (ECF No. 16).